IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 16, 2019 Session

## KAY ARMSTRONG v. KEVIN C. MORRISON

**Appeal from the Chancery Court for Greene County**
**No. 2017-CV-316    John C. Rambo, Chancellor[1]**

_____

**No. E2018-01985-COA-R3-CV**

_____

This appeal concerns a clerk and master's petition for additional staff. Kay Solomon Armstrong, Clerk and Master of Greene County ("Petitioner"), filed a petition against the County Mayor ("Defendant") in the Chancery Court for Greene County ("the Trial Court") seeking additional staff for her office.[2] After a trial, the Trial Court entered an order replacing one half-time position in the office with one full-time position. The Trial Court also awarded Petitioner attorney's fees and expenses to be paid from the fees of the Clerk and Master's Office. Defendant appeals to this Court, arguing that the evidence preponderates against the Trial Court's decision to award additional funding for a new full-time assistant to replace a half-time assistant and that Petitioner was not entitled to recover any attorney's fees. We hold that reasonable attorney's fees were recoverable by Petitioner pursuant to statute. We hold further that the evidence does not preponderate against the Trial Court's factual findings, including the Trial Court's core finding that Petitioner's workspace is so structurally inefficient that her office requires more staff. We modify the Trial Court's order on fees and expenses to the extent it failed to award Petitioner expenses she paid out of pocket. On remand, the Trial Court is to determine and enter an award including reimbursing Petitioner for her reasonable out-of-pocket fees and expenses. We affirm, as modified, the judgment of the Trial Court, and remand for further proceedings consistent with this Opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed, as Modified; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which ANDY D. BENNETT and JOHN W. MCCLARTY, JJ., joined.

_____

[1] Sitting by interchange.

[2] The original defendant was Mayor David Crum, in his official capacity. After trial, Kevin C. Morrison was elected Greene County Mayor and became the new defendant, also in his official capacity. For convenience, we will refer simply to "Defendant" where appropriate.

Mark S. Dessauer and Suzanne S. Cook, Kingsport, Tennessee, for the appellant, Kevin C. Morrison, in his official capacity as Mayor of Greene County, Tennessee.

Matthew A. Grossman and Kevin A. Dean, Knoxville, Tennessee, and, James R. Wheeler, Jonesborough, Tennessee, for the appellee, Kay Solomon Armstrong, in her official capacity as Clerk and Master of Greene County, Tennessee.

**OPINION**

**Background**

In August 2017, Petitioner sued Defendant in the Trial Court seeking more funding for staff than the Greene County Commission provided in the 2017-2018 budget. The Greene County Clerk and Master's Office had five full-time employees and one half-time employee. Petitioner sought one new full-time employee as well as another part-time employee. Petitioner's dual-pronged argument for additional staff was that (1) she has lost experienced personnel in recent times and (2) that the physical layout of her office located in a nineteenth century courthouse basement is unconducive to efficiency. Defendant, in response, has argued throughout that Petitioner does not need any additional staff. Defendant also has pointed to Petitioner's previous policy of closing her office to the public on Wednesdays as evidence that Petitioner and her staff have failed to attend to their duties. Petitioner contends those closures were necessary to complete the work of the Clerk and Master's Office. The proceedings became contentious, and Mayor David Crum's attorney, Suzanne Cook, filed a BPR complaint against Petitioner's attorney, Matthew Grossman, for addressing the Greene County Commission with Mayor Crum present outside the presence of the Mayor's counsel. That complaint later was dismissed.

This case was tried on March 27 and 28, 2018, and April 10 and 13, 2018. We quote some of the most pertinent testimony from trial. Barbara Tallent ("Tallent"), an interior designer, testified for Petitioner regarding the physical structure of the Greene County Clerk and Master's office and its detrimental effect on the staff's efficiency:

> Q. And I believe the -- the question was could you compare the Greene County Clerk and Master space to what the -- to what the, pardon me, what the Clerk and Master has here in Washington County?
> A. Certainly. I did have the opportunity to walk through the space but even if I hadn't gone behind the glass I could easily have observed that the sight lines are 180 degrees better than what they are in Greene County. I wouldn't want anybody to think that the Greene County situation looks anything like it does here. The two could not be more different. If you'll

notice, maybe on break, every staff member there has a sight line to the front counter and the counters are at different heights for wheelchair accessibility, standing height. I mean, it's -- it's a great layout. Even as you work through the department you'll see people in private offices who also have glass fronts to their offices, again so that they can maintain visibility. They will see if someone has left the front counter and they'll know that they need to staff that window. It's also greater auditory communication. You're not trying to strain to hear what's going on and that's a great assistance in training people. You know, you -- you learn a lot just by hearing how someone else is dealing with a situation. And cross-training and covering for one another is better enabled that way. So what you see here is a great example of more modern design approaches that we do day in, day out for offices now, whether it be banks, utility districts, government offices. Anyone that deals with the public those sight lines are absolutely critical. It's -- it's probably the number one programing criteria that we're asked for when designing for offices like this.

***

Q. . . . Do you have any opinion as to if the Greene County Clerk and Master had a space that was situated more like the Washington County Clerk and Master how would that affect Ms. Armstrong's staffing needs?
A. In my opinion I believe the current staff that she has would be better accommodated in an office such as the Washington County Clerk and Master's office. In her current office environment it is understandable that it would require more staff to do the same duties, given the floor plan.

On cross-examination, Tallent was pressed on whether the problem was Petitioner's workspace or Petitioner's ability to manage her office:

Q. As I understand your testimony, you're not saying Ms. Armstrong needs more staff, are you?
A. Actually I am.
Q. But aren't you also saying that if there were more staff in that office it would be more inefficient?
A. No. I'm saying that having more staff would allow them to perform the duties that they are required to do which would -- the most primary is to service the -- the walk-up customers at those windows.
Q. Did you do any analysis of what other factors might impact workplace efficiency in any given environment?

-3-

A. As it pertains to this specific project, yes.

Q. Okay. What else did you -- what other factors did you review?

A. Other factors are, for example, where their filing is. Currently it's spread throughout the building even as far as to the attic which lets me know there -- say for example, someone needs to pull a file, they not only have to leave the department, they may have to leave the floor and that creates a longer time when someone is away from their desk or away from their window.

Q. Doesn't that relate to the management of the space as opposed to the space itself?

A. I wouldn't think so. There's nowhere for all of their files to be housed within the department.

Q. Wouldn't you agree, ma'am, that there are a number of things that impact workplace productivity and employee efficiency other than the configuration of the office space?

A. I would agree.

Q. For example, the work ethic of your employees?

A. I would agree.

Q. You did no analysis of that, did you, ma'am?

A. Only observation.

Q. And would you also agree effective management impacts workplace productivity?

A. Absolutely.

Q. Did you do any analysis or review of Ms. -- Ms. Armstrong's policies, practice and procedures for employees?

A. I only observed.

Petitioner took the stand, as well. Petitioner testified that the loss of experienced staff had hindered her office's efficiency as of late:

Q. Between 2016 and the present -- well, in -- in Fiscal Year 2016 beginning or we'll say '15/16, what was approximately your total tenure of your staff?

A. Chancellor, I -- I might have to look at my notes but I recall in 2015 my total years of experience was 103. My lawyer will probably tell me if I'm wrong because he probably knows the number but 103 years in 2015/16.

Q. And what's -- what's the total tenure of your staff as we sit here today?

A. Not counting me it's 43 years so that's a difference -- I think that's somewhere like 58 percent of loss.

The Court: Your years of experience is not in the 103, right?

The Witness: No, sir.

The Court: Okay.

By Mr. Grossman:

Q. And I guess -- I guess, Your Honor, if you -- how -- how many years have you been in the post?

A. I'm in my 26th year.

Q. So obviously I guess adding -- adding that to both the 103 number and the 43 number would make that -- roughly figure that out, what percentage are you still losing?

A. Approximately 50 percent.

Q. What is the biggest problem that has resulted from this staffing -- from this loss of tenured staff?

A. I can't get the work done, Chancellor. I can't provide the service I need to provide in the manner the taxpayer is accustomed to and I can't serve my bench in the manner my judge is used to. I can't meet the deadlines and I -- I have realized the worst this -- the more time passes the worse it gets and that creates more potential liability for my county if some -- if there is a failure, if there's something missed.

Q. About how long does it take to replace tenured staff -- well, let me ask -- let me ask a different way. Is -- how easy is it [to] replace tenured staff with -- with someone who can jump right into the position?

A. In Greene County it's almost impossible. I have lived this for 26 years and I've seen people come and I've seen people go. When Tonya left after being there 11 years -- she wasn't the excellent employee she was when she left when she first started. It -- it -- and she's smart girl and the Circuit Clerk is blessed to have her but it took her over five years to get to that level of efficiency. So by my evaluation, having lived this for 26 years, if you have a tenured person of 10 years, one decade, and they leave, they leave and you need to replace them with a human plus a half of another. When Russell Wexler died in -- suddenly in 2016, him being there 25 years, that's two decades, we need two halves or one whole to replace him, not just his position but another whole human. And then, now we have Jeanne Tweed having retired as her notice dated March the 21st of this year, she's in her 32nd year. That's three decades. That is one and a half positions by my evaluation.

Q. Okay.

***

Q. How many hours a week do you normally work?

A. More than 40 hours a week do I work.

Q. Do you take work home?

A. I take work home. I don't take court files home. I -- I will copy a section or I will take bags or boxes and I will do work after hours at home in particularly because it's less congested at my counter in the morning, I will do work offsite and then arrive at the courthouse after that period of work done. I've even done it in my car. Once you come into that courthouse and you get on that front counter it's like fighting fire. So in order to have uninterrupted thought to work on something more complex, I will hide out for a while or try to work on my forms or try to understand what a new requirement is that I need to address.

Q. Is your cell phone number publically available?

A. Yes. Most members of the bar in Northeast Tennessee I've offered my cell phone number to.

Q. When do you answer that phone?

A. I will answer my personal cell phone 24/7.

Q. Are you able to carry out all of the mandated functions of your office without the assistance of deputies and assistants at this time?

A. Absolutely not.

Q. Are you able to carry out all the mandated functions of your office with the deputies and assistants that are currently provided for in the budget?

A. Absolutely not.

Q. Just briefly tell the Court how your office is functioning.

A. We're not functioning; we're existing. We're taking care of the customer that's right in front of us and we're -- and we're answering the phone. But I am here to ask you, Chancellor, to -- for relief because Greene County doesn't have a Clerk and Master right now. You have a good front counter clerk and I'm not able to attend to my Chancellor and to the other judges in the Third like I had been accustomed and -- and taught to do.

\*\*\*

Q. And you're asking the Court to authorize the new one -- one full-time and one part-time position as set forth in there?

A. Yes, if not more.

On recross-examination, Petitioner was questioned regarding her practice of performing some of her clerk and master duties from home:

Q. And, ma'am, you were explaining to the Chancellor that you have some pattern of doing work from home and doing emails before you come into the office. You agree with me your staff is in the office, or should be, to have the office up and running by 8:00 in the morning, correct?

A. Yes.

Q. And your staff needs you to be in the office as well doing tasks. In other words, if you're working from home and they're in the office that's not a very efficient operation for you to direct your staff or supervise your staff or deal with problems in the office, is it?

A. It's quite the contrary. To be able to manage a small shop like that and have -- and help them in the more activity part of the day -- the more active part of the day is you -- it's best to be out in the first morning hours as opposed to lunchtime and going after. That's when we're busy. That's when they need the help. That's when they need the managing. That's when the liability is, more after lunchtime and going down, not in the morning. So in an effort to properly manage my office, my Chancellor and the Chancellor before me knows that it's a time to be able to -- to prepare and plan and do the catchup in the early morning time and I stay offsite on purpose.

The Court: Do I understand that you're telling me that the -- both the current and his predecessor Chancellor are aware that you physically did not come into the office until later in the morning on some frequency?

The Witness: Yes.

Another witness to testify was Attorney Kidwell King ("King"), who practices in Greene County. King testified regarding the performance of the Clerk and Master's Office. King stated, as pertinent:

Q. What kind of challenges can you face when doing investigations of old cases in the Clerk and Master's office?

A. Challenges? They're always extremely busy. There's no flexibility in that office. I'm always very sensitive about the fact if I'm asking them for help I'm pulling them away from doing other work. They're always helpful. They're always up to the task but I can say I'm always careful. The -- the physical layout is a problem on occasion because the -- the office is so disjointed. There's so many different rooms and different places of people hidden away. It didn't -- it not just difficult for me, it's difficult for the staff to stay in contact with each other when I'm there but, like I say, the staff is always helpful.

***

Q. Have you observed any problems with the -- the rate of the work getting completed in that office?

-7-

A. It seems as if the rate of getting things accomplished has slowed down in the last year or two. That's an observation.

Shifting to Defendant's case, Defendant advanced the position that Petitioner and her staff were inefficient, unproductive relative to other counties, and often times not even in the office when it was open. To this end, Defendant relied heavily on video surveillance evidence reflecting that Petitioner or her staff either arrived late, left early, or were otherwise absent. Ellen Pollock ("Pollock"), a paralegal, testified regarding discrepancies in the time reported as having been spent in the office by Petitioner and her staff:

Q. All right. Ms. Pollock, would you identify the -- the summary that I've handed you there? And if you could walk through that for the Court as to what that reflects.
A. Okay. So this is just a summary of Ms. Armstrong's discrepancies in terms of her time in and out of the office. She does not fill out a time card so there was no data to determine lunch hours or that sort of thing. So it -- I basically just watched her entrances and exits throughout the day. So, again, I watched 123 working days from April 17th until October 17th. During the course of that 123 days there were 87 days where she arrived late to work, and late being that the Clerk and Master's office opens at 8:00 o'clock so one would assume that she would be there at 8:00.

On cross-examination, Pollock was questioned as to the possible limitations of her methodology. Pollock stated, in part:

Q. If an employee eats lunch at her desk and works through lunch, how would you have recorded that?
A. It's not my job to report what she did at lunch. Her job is to report on her time card. If she put 12:00 to 1:00, whether she left the building or stayed inside, she took lunch from 12:00 to 1:00 on her time card. So there's an hour given to her on her time card.
Q. And -- and we can clarify that. You didn't attempt to give an employee credit for working through lunch as part of this summary?
A. They should credit themselves on their time card if they work through lunch.
Q. Let's address it a different way, Ms. Pollock. An employee is out from 12:00 to 1:30, they report 12:00 to 1:00 on their time sheet, you would've docked them on your summary for 30 minutes, correct?
A. If it -- if it was from the start of their lunch and continued until the time they returned that's the time period for lunch, yes.

Q. Okay. But if that same employee ate at their desk from 12:00 to 12:30 and worked from 12:30 to 1:00, that is not recorded on this summary?
A. I'm sorry, can you say that again?
Q. If -- if an employee took a 12:00 to 12:30 lunch and then worked from 12:30 to 1:00, that would not be reported on your summary that they worked an extra half hour?
A. No. That's what their time card is for. They make that notation.
Q. I believe you told me that you did not review Greene County's policies and procedures on breaks?
A. No.
Q. Have you reviewed any of the Greene County policies related to visits to the Greene County Health Clinic?
A. No.
Q. So you're not aware of whether an employee is entitled to be paid for time spent visiting the health clinic?
A. I didn't need to know that for the purposes of watching surveillance.
Q. Because it's a pure in-and-out of the building analysis?
A. Yes.

Chancellor Douglas Jenkins, who had appointed Petitioner to her most recent term in office and having recused himself in this matter, was voir dired prior to testifying. Chancellor Jenkins had text messaged about the case with Hawkins County Clerk and Master Holly Jaynes as she sat in the courtroom during trial. Defendant contends that Ms. Jaynes served as a "mole" in violation of the rule of sequestration. With respect to his communications with Ms. Jaynes, Chancellor Jenkins stated:

Q. And I take it you knew that we had our first day of trial on March 27th?
A. Yes.
Q. And I understand that you -- that Ms. Jaynes, Holly Jaynes, was in the courtroom that day?
A. Yes.
Q. And the following day did you speak to Ms. Jaynes?
A. No. I spoke to Ms. Jaynes during the trial. She sent me some texts. When something would happen during the trial that -- that surprised her or something that she thought was noteworthy she texted to me. I've preserved all those texts. But the texts that are relevant to this inquiry are about nine or 10 texts where she did tell me things about Lee Akers' testimony and also -- well, I think it was all during Lee's testimony. So my thinking at the time -- I was down below the house doing something. I wasn't paying any attention but my thinking at the time was that as I was only a rebuttal witness, so I don't think I'll have to rebut anything Lee says.

-9-

But at the same time I -- when we had our conference call the other day I did disclose that I've had these text conversation with Ms. Jaynes. And, listen, I have it with me. You're more than welcome to look at it and if -- and I'm not here to beat around the bush. I'm here to be perfectly honest with the Court. If this excludes me, it excludes me, okay?

***

Q. All right. Please continue.
A. All right. So at Tuesday at 12:26 Holly texted me and said, "Dessauer asked if Akers knew court didn't start till 10. How is that relevant?" And so I then texted back and said, "What did Lee say?" and "It's in the local rules." And then Holly said, "Said he didn't know that." So there is an instance where Holly told me about something that happened in the courtroom. Then she advised me that Kay had "Not been on yet. Judge Inman briefly, interior designer (just) how office is set up and Lee." And I said, "OK. Good deal. How did Judge Inman do?" And she said, "Good. Really didn't ask him much. Just fact he appointed her and satisfied with her work and appointment had nothing to do with her being her mother's daughter." Then at about -- at 12:51 Holly texted me and said, "He asked Lee if ever considered himself hired hand of the Chancellor??" And then at 5:09 it says, "SC," Suzanne Cook, "... on her heavy about girls she had there working and paying out of her pocket as violating laws." And let's...
Q. Did you respond to that one, Judge?
A. Pardon me?
Q. Did you respond to that text?
A. I did. I said, "OK. I disagree, but OK." And then do you want Holly's response to that?
Q. Yes.
A. She texted back and said, "I do too." And then Holly texted me at 5:13 -- there was no other -- there's a long time between these two little spurts of texts. But then at 5:13 Holly texts, "She just asked her if you were aware of it." And I'm assuming that's what I just referred to before about the -- violating the laws by having some part-time person paid out of pocket in there. And I said, my response to that is, "I can go answer that tomorrow!" This is just me and Holly texting back and forth. And Holly said, "Now she's asking about time cards," at 5:15. And do you want my response to that?
Q. Yes, please.
A. I said, "Well if she's hiring her own and using extra part-time, doesn't that mean she has a need?" And then at 5:27 Holly texted me and said, "SC

-10-

saying she could pay them from the extra she had for PT," which I assume is part-time.  And then, "Saying liability to county to have them there and paying out of pocket."  And that's -- that's a conclusion of all the text conversation.

***

Q. So you've had no conversations with Ms. Armstrong about the testimony thus far?
A. No, sir.
Q. And I take it you're familiar with the Rule of Sequestration?
A. I am but I'm not sure I was under that rule.
Q. Did you know that Judge Rambo had put it in place. . .
A. I. . .
Q. . . .in this trial?
A. I did not.
Q. But you assumed he did, did you not?
A. Well, I didn't make any assumptions, frankly.  I was just down there below the house doing something.
Q. Well, I take it you're familiar with the Rule and. . .
A. Absolutely.  I put it into place all the time.
Q. You put it in play all the time.  Your Honor, we don't have anymore questions, but we would ask the Court based on the Chancellor's testimony that he be excluded from testifying in this trial.

***

The Court: All right.  I'm -- I'm ready to rule on this.  I've heard what Chancellor Jenkins has stated and this is a -- a little bit different in this sense: We know exactly the conversations that or conversation that occurred.  It's documented and he's laid it out there for us.  Part of the purpose of 615 is when a witness is briefed we really don't know what has been told to them, whether their testimony is the result of their own thoughts or whether their testimony is the result of corroborating with other witnesses.  Because we have the documents, the best evidence of the conversation, the evidence exists so that he can be cross examined or impeached on any testimony that you feel like has been tainted by what has been said in the text message exchanges.  So this will go to the quality of Chancellor Jenkins' testimony and how persuasive it is but I'm not going to exclude under 615 because I think whatever problems the exchange have occurred it can be addressed by the Court knowing the conversations and

-11-

hearing the Chancellor's testimony, also him being cross examined on this. So any problems will be remedied because we have the context of the conversation in -- in paper. We have it. So that's my ruling. I'll need you here Friday morning to testify, please.

The Trial Court thus determined that Chancellor Jenkins could testify despite his courtroom communications. When the Chancellor later took the stand, he testified regarding Petitioner's work habits as follows:

Q. And are you aware of Ms. Armstrong regularly working from home?
A. Yes.
Q. Okay. And does the location of her house impact that as far as if she needs to meet you somewhere or do something like that?
A. It would make it much more convenient for her to meet me at Exit 23 but I don't -- I don't know that that makes it more or less easier, I guess, for her to work from home. I don't know what that's got to do with that but she works from home and I don't mind it a bit.
Q. All right. Are you aware of what she's doing while working at home?
A. No. I just have to take her word for it. I've never been there and audited her workload.
Q. Yes, sir. Does she have other occasions than what you've already talked about today to be outside her office or outside the courthouse but yet still be working on Greene County business?
A. Yes.

Continuing his testimony, Chancellor Jenkins stated, in part:

Q. Well, let me see if you'll agree with this statement: Do you believe -- do you agree that if a court clerk's office is closed to the public that it's not open for the transaction of business?
A. Well, that's debatable in this particular case because all somebody's got to do is beat on the door and somebody will open the door. If a lawyer's got a statute running they can call Kay. Everybody in town has got her cell phone. She's the most accessible Clerk and Master you ever saw.
Q. So why are the. . .
A. Plus we're doing all the work. We're not -- I say all, we're not doing all -- we're doing 60 percent of the work. If we're so inaccessible how are people getting in there to get 60 percent of it filed in our court?
Q. So what's the point of closing to the public then if. . .
A. They have -- the girls are snowed under. They -- they can't -- listen, they can't get their work done. People come to the window, they want to --

-12-

they -- it's a distraction. Those girls are in there hibernating getting their work done on Wednesday.

In May 2018, the Trial Court entered a highly detailed order on whether Petitioner had proven a need for additional staff, from which we quote only a portion. Ultimately, the Trial Court eliminated one half-time position at an annual salary of $16,380 and replaced it with a full-time position at an annual salary of $24,375, essentially taking Petitioner from 5.5 to 6 staff members. Also, $10,500 was set aside for two part-time assistants to serve when court is in session. The Trial Court stated, in part:

> The Defendant proved that timesheets were incorrectly completed, but the ultimate issue is how many deputies are needed. To simplify Defendant's theory of the case, even if Petitioner herself is devoting her entire working time to the business of the office, Defendant believes the Clerk and Master does not need additional deputy clerks, because she is not properly managing the deputies she has. Although the timesheets were inaccurate, the videos failed to persuade the Court that Petitioner's deputy clerks were not working the hours required of the office. If the Clerk and Master and her deputy clerks were not actually working the requisite hours of the county workweek, then this neglect of duties would necessarily have affected the determination of how many deputies were needed. The Court was persuaded the Clerk and Master and her deputies regularly work full workweeks, but the deputy clerks estimated their arrival and departure times, until recent timekeeping changes were implemented.
>
> ***
>
> As to the County Mayor's theory, the Court finds that the Clerk and Master and her deputies are working on Wednesday on governmental functions associated with her office, and therefore, the hours of operation that are closed to the public are not evidence that the Clerk and Master is failing to devote her entire working time to the duties of her office.
>
> ***
>
> The Court received testimony from attorney Kidwell King, who has practiced primarily in Greene County for over 40 years. His work is primarily concentrated in the Chancery and Probate Courts of Greene County. His testimony was consistent with others regarding office personnel appearing in near-constant motion. He verified the employees appear to be busy, and most significantly, his testimony was credible that

-13-

work output has decreased in the last year to two years. This is consistent with Clerk and Master's loss of experienced deputy clerks. Although he made no formal written complaint, Mr. King did report to Chancellor Jenkins that the Clerk and Master's office failed timely send some creditor claims to estate personal representatives, which complicated the administration of some estates. Finally, his testimony verified the testimony of the Clerk and Master that she is very accessible to the attorneys practicing in her courts.

***

The most insightful testimony regarding the staffing needs of the Clerk and Master's office came from the interior designer. The physical layout of the offices occupied by the Clerk and Master's staff compromises their productivity. The primary office of the Clerk and Master is segregated from the rest of the office.

The management responsibilities of the Clerk and Master may be better served by locating her workstation across the hallway with her staff to be more accessible to them. This would allow her to disseminate her knowledge to them, to more quickly answer their questions so they can remain at their workstations, and it would allow her to cross-train her staff so more tasks can be accomplished by a staff member without "running around" within the office seeking help. Although the Clerk and Master may have considered all of this prior to asking for two more deputies, she failed to demonstrate in Court that she had considered or made improvements in work assignments to minimize the effects of her inefficient workspace.

Although the Clerk and Master's evidence was unpersuasive of a need for two new deputies, the Clerk and Master's evidence was sufficient to prove by a preponderance of the evidence that she has a need for more staffing in her office. Her office layout means that more staff work is needed than otherwise to account for the logistical problems caused by the chopped up nature of her offices. Further, more help is needed to account for vacancies in her office and loss of experienced deputies with management responsibilities.

A knowledgeable and capable staff overcame the logistics of the basement move for years because of their experience. The Clerk and Master no longer has the same well-trained staff.

-14-

Although the court rejects the assertion that two new employees are needed to replace a veteran employee, turnover is expected and is currently not accounted for in the staffing of the office. The ability to complete work has been compromised by the turnover in her office. The testimony of Kidwell King demonstrated this shortcoming, and the last two years have demonstrated the Clerk and Master is struggling to train and keep deputy clerks. Ms. Armstrong and Chancellor Jenkins collaborated in the hiring of paralegal Jeanne Pryor, but she left after one year. When employees leave, the remaining deputies have to accomplish the same work. When employees take vacation or sick leave, the work continues. Having some additional staffing hours also means the Clerk and Master would have more flexibility regarding lunch breaks.

***

Since salaries are low and turnover has become a problem, the Clerk and Master's office is going to suffer from being short-handed. While five experienced deputies may be sufficient to operate the office, five positions held by persons coming and going are not. By a preponderance of the evidence, the Court finds the turnover in the office was not the fault of the Clerk and Master, this turnover has now been continuous for at least two years, and it is exacerbated by low entry salaries. The evidence demonstrated the Clerk and Master needs six full-time positions to have five full-time deputies available to work in the office. Between vacations, sick time, breaks, lunch, and turnover, the Clerk and Master needs six full-time positions to keep five deputies working throughout the workday and workweek. Because the Clerk and Master has lost her chief deputy and Mr. Wexler, the Clerk and Master will now need to change her schedule to allow her to consistently be in the office when it opens to provide supervision and training. The nearly constant training and turnover is the more apparent crisis that she needs to handle, and she is the one best suited to train. The Court eliminates the present halftime position and replaces it with one full-time position.

As to part-time help, the logistics and needs of the Chancery Court in Greene County impose upon the Clerk and Master the responsibility to have multiple deputies in attendance in the courtroom when the chancellor is in session. The Clerk and Master has previously hired "handmaids" to assist her within the office, but the better use of "handmaid" would be to serve as the runners between the courtroom and the offices when court is in

session.  Further, they should be deputized and placed on the Greene County payroll when hired.

The budget approved by the Greene County Board of County Commissioners allocates sufficient funds for the Clerk and Master to hire part-time deputies to assist the Clerk and Master on the three to six court days per month to perform running duties between the courtroom and the clerk's office when court is in sessions.  This would eliminate the need to have experienced deputies running files and documents back and forth on court day.  The Court allocates up to $8.40 per hour to hire two part-time deputies to fulfill the role of "handmaids" when court is in session.  As Court is typically in session up to six times per month, the Clerk and Master's salary for each position is limited to 600 hours per fiscal year, which is an average of 50 hours per month.  The Clerk and Master is thus limited to a total of $10,500 per fiscal year for her two part-time deputies.  Although she requested two half-time employees, she is authorized to employee two part-time employees at any given time, so long as she does not exceed $10,500 during the fiscal year.

Pursuant to Tenn. Code Ann. § 8-20-107, the Trial Court found that Petitioner was entitled to attorney's fees.  Petitioner thereafter renewed her "Motion for Authority to Pay Costs, Expenses and Attorney's Fees and Costs" regarding the law firm of Frantz, McConnell & Seymour, LLP, James Wheeler, and costs and expenses that Petitioner had paid personally, totaling $155,190.88, $77,250.94, and $7,738.93, respectively.  Defendant filed objections.  In August 2018, a hearing was conducted on Petitioner's claim for attorney's fees.  In October 2018, the Trial Court entered its order regarding attorney's fees whereby it awarded Petitioner total fees and expenses of $180,870.79 to be paid from the fees of the Clerk and Master's Office.  In this, its final judgment, the Trial Court performed an analysis applying Supreme Court Rule 8, RPC 1.5, stating as pertinent:

Upon a review of the affidavits in support of fees, pleadings filed, and the Court's observations from court appearances and trial, the Court finds as follows:

1. Mr. Wheeler's fee rate of $225 per hour is a reasonable rate given the customarily charged rates in the Third Judicial District for similar legal services performed by an attorney with the experience, reputation, and ability of Mr. Wheeler.  The paralegal rates of $95 are, likewise, reasonable.

-16-

2. The rate of $265 of Mr. Grossman and Mr. Dean is higher than the customary rate for litigation in the Third Judicial District. The Court is not persuaded that qualified and experienced attorneys were not locally available to assist the Petitioner. Further, Northeast Tennessee, attorneys from throughout the First, Second and Third Judicial Districts are local for Greene County, and there are many attorneys near Greene County who are qualified to handle this type of litigation. The law concerning this type of case is not complicated or novel, to the contrary, it is well-settled. Although Mr. Grossman and Mr. Dean have experience in handling salary suits for county officials, it is not a specialty beyond the capability of local counsel or nearby counsel. A premium hourly rate is not justified.

3. This matter did not involve particularly novel issues or complicated legal principles; rather, it involved extensive demands upon the attorneys' time to meet the aggressive defenses and claims of Defendant. Further, the case became more complicated when issues of ethics were added when asserted by Respondent and his attorneys. In a short period, extensive pleadings were filed by the County Mayor and Clerk and Master. Both parties engaged in extensive pre-trial discovery and pre-trial pleadings. The County Mayor scrutinized the work and proficiency of the Clerk and Master and each staff member in her office. No rock was left unturned. Predictably, the Clerk and Master defended against each of the County Mayor's claims and assertions. The attorneys were required to engage in extensive correspondence, extensive communication, and file and appear for many court hearings on many issues. The time requested by Petitioner's attorneys was reasonable.

4. The attorneys for the Clerk and Master obtained a favorable result, but less than requested by their client. The Clerk and Master received an incremental increase in the staffing of her office, principally the conversion of a half-time position to a full-time position. The funding the Clerk and Master initially requested pales in comparison to the attorney fees associated with this case.

5. The Court offered the County Mayor and Clerk and Master a quick hearing after the litigation was filed. However, the attorneys for both officials desired to fully engage in discovery and extensive pre-trial preparation. There are costs associated with this approach to litigation, only one of which is financial. The fees requested by the Clerk and Master reflect efforts from her attorneys that are concomitant with the efforts of the County Mayor's attorneys. Stated another way, the efforts of the attorneys

-17-

for each party were met and balanced by the efforts of the litigation team of the other party.

The appearance of attorneys at a public meeting became the basis for a professional conduct complaint to the Board of Professional Responsibility. The decision by Mr. Grossman to recommend the Clerk and Master to hire additional counsel was prudent under the circumstances, as the parties were aware the Court intended to preserve the litigation and trial schedule. There was no break in the litigation while the issues of professional conduct were reviewed. The Clerk and Master's hiring of Mr. Wheeler was necessary, so she could continue to receive advice and counsel on how the professional conduct complaint would affect her case and case preparation. This was an expenses that was necessary for her to incur in her official capacity. Further, if Mr. Grossman and his firm were disqualified, she needed counsel ready to proceed. As the trial date approached, the County Mayor had two attorneys in the courtroom to represent him. Mr. Wheeler's representation expanded to actively prepare and present during the trial. However, the Court adjusted the fees allowed to account for the payment of two attorneys at trial instead of three.

The time limitations imposed by the Court to move this case to trial required the attorneys to devote time to this case and most likely affected their ability to work on other matters. This was a factor that supported the rates requested by counsel.

6. The attorneys do not have an on-going attorney-client relationship. They were hired for this case, so the nature and length of the professional relationship with the client is not a factor to support the higher rates, because they have not paid a higher rate on an ongoing basis with these attorneys.

7. Petitioner's attorneys were experienced by years of practice, and they enjoy favorable reputations for their ability and ethics. This factor supports their requested rates.

8. The fees charged by Petitioner's attorneys were not contingent. They were fixed for payment by hours worked. This is not a case were the County Mayor and Clerk and Master in their salary suit reached an understanding they would litigate their differences but would require their attorneys to accept their case with a maximum fee not to exceed an established limitation such as $50,000 for each party. No, the clients

allowed their attorneys to work without a budget and what appeared to the Court without any resistance to expense or limitation of time and effort. The bills of the County Mayor and the Clerk and Master are subject to the full faith and credit of Greene County government, subject to any limitation on the fees of the attorney as negotiated by the Clerk and Master and as limited and approved by this Court. When assuming their representation, Petitioner's attorneys were not financially at risk that reasonable attorney fees would not be paid. This factor supports a lower rate than requested.

9. Prior advertisements or statements by the lawyer with respect to the fees the lawyer charges were not a factor in determining the reasonableness of rates.

10. The fees of the attorneys are consistent with their contracts with the Clerk and Master.

The Court will allow $225 per hour for Mr. Wheeler, which is a rate customarily seen for litigation work by this Court and consistent for litigation in Greene County. Mr. Wheeler's fee of $225 is reasonable, but the out-of-court rate for work is reduced to $200 for the reasons later stated in this ruling.

Mr. Grossman's rate of $265 is too high for the reasons stated in this ruling, but because he was the lead attorney a fee of $235 is more reasonable, but Mr. Dean's rate is reduced from $265 to $225. Local litigation attorneys are available with rates consistent with the rates closer to Mr. Wheeler. There was no persuasive reason that local attorneys could not handle this case nor is it persuasive that local attorneys were unwilling to represent the Clerk and Master.

The Tennessee Supreme Court has often set a two-tier hourly rate for attorneys representing indigent parities in criminal and child welfare cases. The Supreme Court has approved rates that are less for out-of-court work and higher for in-court work. This is the manner in which the Supreme Court has handled the payment of attorney fees from public funds. The fees in this case will be paid by public funds in Greene County. Much of the work in this case involved out-of-court work, and the volume of work received by the attorneys should be mitigated by the hourly rate charged. The Court finds that $200 per hour for out-of-court work is more reasonable than $265 or $225 per hour charged by the attorneys.

Finally, much time was spent by attorneys responding to a Board of Professional complaint. Work on the professional conduct complaint is not work preparing evidence and testimony to prove the case. It was necessary and important for Mr. Grossman and his firm to respond to a disciplinary complaint, and he may be believe it was unfair, but the regulation of his conduct is a private matter to him and public concern of the judiciary, it is not a public concern of Greene County and its county officials, and the response to the disciplinary complaint is not a proper expenditure of funds from the Clerk and Master, and thus, it is disallowed.

Defendant timely appealed to this Court.

## **Discussion**

Although not stated exactly as such, Defendant raises three issues on appeal: 1) whether the Trial Court erred in permitting Chancellor Douglas Jenkins to testify; 2) whether the evidence preponderates against the Trial Court's factual findings; and, 3) whether attorney's fees are recoverable under Tenn. Code Ann. § 8-20-107. Petitioner raises her own issue, subdivided into numerous arguments, concerning whether her award of attorney's fees and expenses should have been larger still. Related to this last issue, Defendant argues that if any attorney's fees at all are to be allowed to Petitioner, the Trial Court's award was excessive.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001); *Dorning v. Bailey*, 223 S.W.3d 269, 272 (Tenn. Ct. App. 2007). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). Insofar as the issues call for review of discretionary decisions, we apply the abuse of discretion standard. "An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). Regarding witness credibility, our Supreme Court has stated:

When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are "uniquely positioned to observe the demeanor and conduct of witnesses." *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). "[A]ppellate courts will not re-evaluate a

trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *see also Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). In order for evidence to be clear and convincing, it must eliminate any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 221 (Tenn. 2009)). Whether the evidence is clear and convincing is a question of law that appellate courts review de novo without a presumption of correctness. *Reid ex rel. Martiniano v. State*, 396 S.W.3d 478, 515 (Tenn. 2013), (citing *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010)), *cert. denied*, ——— U.S. ———, 134 S.Ct. 224, 187 L.Ed.2d 167 (2013).

*Kelly v. Kelly*, 445 S.W.3d 685, 692-93 (Tenn. 2014).

We first address whether the Trial Court erred in permitting Chancellor Douglas Jenkins to testify. Tennessee Rule of Evidence 615 provides that "[a]t the request of a party the court shall order witnesses . . . excluded at trial or other adjudicatory hearing." The rule, which was requested at trial, goes on to state "[t]he court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness." No specific sanction for violations of the rule is established, as our Supreme Court has explained:

Tennessee Rule of Evidence 615 does not set forth any particular sanctions that should be imposed for its violation. Accordingly, trial courts have significant discretion when deciding how best to deal with its violation. *See, e.g., State v. Upchurch*, 620 S.W.2d 540, 543 (Tenn. Crim. App. 1981) ( "[W]hether to allow or not allow the testimony of a witness who has violated the rule is within the discretion of the trial court."); *Jones v. State*, 548 S.W.2d 329, 332 (Tenn. Crim. App. 1976) (recognizing that "it remains a matter of the Trial Judge's discretion as to whether the witness who violated the rule will be permitted to testify"). This discretion should be exercised in light of both the policies at issue as well as the particular facts and circumstances of the case.

*State v. Jordan*, 325 S.W.3d 1, 41 (Tenn. 2010).

As an initial matter, the Trial Court found in its May 2018 order that "[t]here was no evidence that Chancellor Jenkins was informed of the request for the rule, and there was no suggestion that the Hawkins County Clerk and Master informed him." Further,

the Trial Court found that "Chancellor Jenkins learned of no consequential testimony from these messages." As to the Chancellor's testimony regarding the merits of the case, it appears to have had little impact. While the Trial Court stated that "[h]is testimony did provide some insight on the operations of the Clerk and Master's office," it found "the opinion testimony of Chancellor Jenkins that more assistants are needed is not particularly dispositive."

As stated above, no specific sanction is mandated for a violation of Rule 615. How to respond to a violation of the rule is within a trial court's discretion. Here, Chancellor Jenkins' text message exchange with the Hawkins County Clerk and Master was disclosed and closely scrutinized by the parties and the Trial Court. The Trial Court accounted for Chancellor Jenkins' strongly held preference that Petitioner win, stating that "an opinion from a judge on who should win is not probative of the issues in this case, therefore, this Court discounts Chancellor Jenkins' honestly-held opinion that Petitioner should win." We find no hint in the record that the Trial Court was unduly swayed by Chancellor Jenkins' testimony, or that the Chancellor's courtroom communications somehow prejudiced Defendant. While we do not condone violations of the rule by any witness, we find under "the particular facts and circumstances of the case," *Jordan*, 325 S.W.3d at 41, that the Trial Court did not "reach[ ] an illogical result, resolve[ ] the case on a clearly erroneous assessment of the evidence, or rel[y] on reasoning that causes an injustice" in its discretionary decision to permit Chancellor Jenkins to testify in this bench trial. *Gonsewski*, 350 S.W.3d at 105. In the end, Chancellor Jenkins' testimony had little, if any, discernable impact.

We next address whether the evidence preponderates against the Trial Court's factual findings. We begin by reviewing the statutory scheme. Tenn. Code Ann. § 8-20-101(a)(2016) provides, as relevant:

> (a) Where any one (1) of the clerks and masters of the chancery courts, the county clerks and the clerks of the probate, criminal, circuit and special courts, county trustees, registers of deeds, and sheriffs cannot properly and efficiently conduct the affairs and transact the business of such person's office by devoting such person's entire working time thereto, such person may employ such deputies and assistants as may be actually necessary to the proper conducting of such person's office in the following manner and under the following conditions, namely:
>
> ***
>
> (3) The clerks and masters of the chancery courts, county trustees, county clerks and clerks of the probate courts, and registers of deeds may make

-22-

application to the chancellor, or to one (1) of the chancellors, if there be more than one (1), holding court in their county by sworn petition as above set forth, showing the necessity for a deputy or deputies or assistants, the number required and the salary each should be paid.

Continuing our review of the statutes, Tenn. Code Ann. § 8-20-102 (2016) provides as follows:

Each of the above named officers shall name in the petition the county mayor as the party defendant thereto. A copy of the petition shall be served on the county mayor, who shall file an answer to the petition within five (5) days from the date of service of the petition, either admitting the allegations of the petition or denying same, or making such answer as the county mayor deems advisable under the circumstances. Whereupon, the court shall promptly in term or at chambers have such a hearing on the application, on the petition and answer thereto, as will develop the facts, and the court may hear proof either for or against the petition. The court may allow or disallow the application, either in whole or in part, and may allow the whole number of deputies or assistants applied for or a less number, and may allow the salaries set out in the application or smaller salaries, all as the facts justify.

Our Supreme Court has articulated a petitioning office holder's burden in cases such as these as follows:

The statutory scheme enacted by the general assembly for staffing and compensating the court clerk's office is clear. The office holder must demonstrate: (1) an inability to discharge the duties of a particular office by devoting his or her entire working time thereto;[3] and, (2) the office holder must petition the court and show the necessity for assistants, the number of assistants required, and the salary each should be paid. Tenn. Code Ann. § 8-20-101(a)(1), (3). . . . The requirement for authorization of deputies under Tennessee Code Annotated section 8-20-101(a) states only that an office holder must demonstrate an inability to "properly and efficiently conduct the affairs and transact the business of such person's office by devoting such person's entire working time thereto." Once the necessity of

---

[3] In the sense used in Tennessee Code Annotated section 8-20-101, we construe "working time" to mean a reasonable number of hours. Thus, as the Court of Appeals stated in *Jenkins v. Armstrong*, 31 Tenn. App. 33, 211 S.W.2d 908 (1947), public officials could not be held to the duty of an unreasonable working time beyond what was considered as usual office hours.

> employing assistants is established, the appropriate trial court is empowered
> to determine the number of assistants needed and their salaries.

*Boarman v. Jaynes*, 109 S.W.3d 286, 291 (Tenn. 2003) (footnote in original but renumbered).

Defendant asserts that Petitioner failed to meet her burden. First, Defendant argues that Petitioner failed to devote her entire working time to her duties. As to the normal deference we extend to trial courts on witness credibility, Defendant contends this does not apply because the dispositive evidence was documentary in nature—that is, time card discrepancies, video surveillance, etc. As to Petitioner's alleged need for additional staff, Defendant asserts she has none. Defendant points to the Trial Court's order itself. Even as the Trial Court granted Petitioner a measure of her requested relief, it noted the weakness of her proof, stating "[t]he Clerk and Master's production of evidence was noteworthy for its lack of detail." Finally, Defendant argues that an allegedly deficient workspace is not an appropriate basis for granting additional staff under Tenn. Code Ann. § 8-20-101.

Defendant is correct in that the evidence reflected discrepancies in the time cards. The evidence established also that Petitioner often ran late in the mornings. Indeed, the record reflects Defendant's extensive documentation of instances where Petitioner or her staff were absent from the office. Defendant correctly characterizes this evidence, but the evidence is not necessarily dispositive of the issue. The Trial Court found that "the Clerk and Master and her deputies regularly work full workweeks, but the deputy clerks estimated their arrival and departure times, until recent timekeeping changes were implemented." Regarding Petitioner, the Trial Court found that "[i]n response to the County Mayor claiming she is not devoted to working full-time to her public duties, the Clerk and Master's evidence was convincing that her working time exceeds the normal working hours of a county official."

It is plain that the Trial Court credited Petitioner's testimony with respect to her discharging her duty full-time, including her explanations as to her working from home. Likewise, the Trial Court found that Petitioner's practice of closing to the public on Wednesdays, while perhaps not the proper answer to a staffing shortage, "was not the fulcrum upon which the case is decided." With regard to Petitioner's ability to discharge her duty, the Trial Court again credited Petitioner's testimony. The Trial Court also rendered an explicit credibility determination as to King, the local attorney who testified to the strain the clerk and master's staff was under. The Trial Court rendered its credibility determinations, and we will not disturb those determinations absent clear and convincing evidence. We do not find that Defendant's documentary evidence, consisting

-24-

of a basic in-out-of-office analysis, constitutes clear and convincing evidence sufficient to overturn the Trial Court's credibility determinations.

Turning to Petitioner's workspace, Defendant argues that the layout of her office is irrelevant to the question of additional staff. However, Defendant fails to identify why such evidence is irrelevant. Neither the statutes nor pertinent case law restrict evidence of work environment. Tallent, the interior designer, testified regarding the inefficiency of the clerk and master's cloistered basement workspace. The Trial Court placed significant weight on her testimony. The Trial Court found that "[t]he physical layout of the offices occupied by the Clerk and Master's staff compromises their productivity" and that "[h]er office layout means that more staff work is needed than otherwise to account for the logistical problems caused by the chopped up nature of her offices." Defendant insinuates that an interior designer's opinion has no bearing on the case. The facts are indeed somewhat unusual for a case such as this, but the interior designer's testimony still constitutes evidence, and if the evidence reflects, as it does here, that Petitioner's workspace hurts her office's efficiency such that she needs additional staff, the evidence is relevant to the inquiry.

Petitioner presented evidence that, between an antiquated workspace and the loss of key experienced staff, she is unable to discharge her duties despite devoting her full working time. Petitioner further presented proof as to the necessity of additional staff. The Trial Court heard the proof, made its findings and credibility determinations, and awarded Petitioner a partial measure of her requested relief.

It is not our place to make fresh factual findings or credibility determinations regarding this issue but instead to determine whether the evidence preponderates against the former or the evidence is clear and convincing against the latter. Defendant, in effect, seeks to retry the case on appeal. That is not our role. Having closely reviewed this record on appeal, in our judgment the evidence does not preponderate against the Trial Court's factual findings. That being so, we affirm the Trial Court's decision to award Petitioner funding for a new full-time employee in place of a half-time employee, as well as two part-time employees for when Greene County Chancery Court is in session.

We next address whether attorney's fees are recoverable under Tenn. Code Ann. § 8-20-107. Petitioner argues that Defendant waived consideration of this issue by never raising it below. Defendant argues that insofar as he argued below that Petitioner was not entitled to any attorney's fees, he raised the issue. We prefer to decide appeals on the merits where possible. In this instance, we decline to find waiver.

This issue implicates Tenn. Code Ann. § 8-20-107, which provides:

> The cost of all cases shall be paid out of the fees of the office collected by such officers, and they and each of them shall be allowed a credit for the same in settlement with the county trustee.

Tenn. Code Ann. § 8-20-107 (2016). "The cost" historically has been interpreted to include attorney's fees. *Jenkins v. Armstrong*, 31 Tenn. App. 33, 211 S.W.2d 908, 910 (Tenn. Ct. App. 1947). The *Jenkins* court explained:

> The action of the Chancellor in allowing a fee of $125 for the solicitor for petitioner and ordering that this fee be paid out of the fees of the office of petitioner and that she have credit therefor in her settlement with the County Trustee, seems, likewise, to have been well within his authority and discretion. While the filing of such petition and the prosecution thereof toward the relief sought is certainly for the benefit of petitioner and her relief, it is also, when filed in a proper case, as contemplated by the statutes, for the benefit of the office and its proper administration. In this, as well as in the funds affected, the defendant County Judge, and his constitutents, the people of the County, have a real and continuing interest. It is certainly a necessary expense or "cost"; for none could contend that the petitioner could properly file and prosecute toward the relief sought, without the employment of legal assistance. Thus, considered, it has even broader application than the usual administrative and trust funds in which a common interest of litigants exists, and where such authority of the Chancellor is unquestioned. It becomes an expense or "cost" of a proper administration of the office. Whether it is significant or merely a coincident, it will be noted that Section 10733 of the Code mentions "the cost" of all cases rather than the "costs," the usual technical term for costs incident to suits, providing that "The cost of all cases shall be paid out of the fees of the office," etc. But, regardless of technicalities, it seems to us that the order made by the Chancellor is well within the letter and spirit of the law, and that no error was committed in allowing such fee and ordering it be paid out of the fees of the office, and that credit therefor be had in her settlement with the County. It results that this part of the decree must be affirmed.

*Id*. Nearer to the present, this Court has reiterated *Jenkins*. In a 2006 opinion, we held that "in cases filed pursuant to section 8-20-101 *et seq*. of the Tennessee Code, the trial court is vested not only with the discretion to award attorney's fees, but also has the discretion to set the amount of such fees." *Patterson v. Wharton*, No. W2005-02494-COA-R3-CV, 2006 WL 1237266, at *7 (Tenn. Ct. App. May 10, 2006), *no appl. perm. appeal filed*.

Notwithstanding these precedents, Defendant cites *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303 (Tenn. 2009) for the proposition that "cost" in Tenn. Code Ann. § 8-20-107 does not encompass attorney's fees. In *Cracker Barrel Old Country Store*, plaintiff landowners sued adjoining landowners seeking to block them from expanding a building on the latter's property. *Id*. at 307. In so doing, plaintiffs relied on the terms of a Declaration of Reciprocal Rights and Easements and Restrictive Covenants created by the original developer, which granted mutual vehicular easements to the adjoining owners and prohibited obstruction to traffic flow. *Id*. at 306. The trial court later entered the Agreed Judgment and Permanent Injunction permanently enjoining defendants from expanding the building on their property. *Id*. at 307. However, the trial court declined to award plaintiffs any attorney's fees, concluding that the Declaration did not provide for such. *Id*. at 308. In relevant part, the Declaration stated: "All costs and expenses of any suit or proceeding shall be assessed against the defaulting party." *Id*. at 307. Plaintiffs appealed the denial of attorney's fees, and the Court of Appeals affirmed. *Id*. at 308. Our Supreme Court granted application for appeal to "to clarify the application of the American rule regarding attorney fees to the language in the Declaration." *Id*. The American rule, which is followed in Tennessee, means that "a party in a civil action may recover attorney fees only if: (1) a contractual or statutory provision creates a right to recover attorney fees; or (2) some other recognized exception to the American rule applies, allowing for recovery of such fees in a particular case." *Id*. Our Supreme Court held that the language contained in the Declaration did not provide a basis for attorney's fees, stating that "if the parties intend to create contractually a right to recover attorney fees, the contractual language must specifically and expressly articulate this intent and not merely provide for recovery of 'costs and expenses.'" *Id*. at 311.

The High Court went on to, among other things, address plaintiffs' arguments that certain statutes containing similar language had been interpreted to establish a right to recover attorney's fees. First, the Court stated:

> In *State ex rel. Burson v. Duromatic Prods. Corp.*, No. 01A01-9305-CH-00220, 1993 WL 545460, at *8 (Tenn. Ct. App. Dec. 30, 1993) (no app. for perm. app. filed), the Court of Appeals held that the statutory language "[d]amages may include any expenses incurred in investigating and enforcing this part," found in the Tennessee Water Quality Control Act, Tenn. Code Ann. § 69-3-116(c) (1987), created a right to recover "the expense of attorney's fees." The Court of Appeals' decision included no analysis of precedent, legislative history, or other legal authority to support this conclusion. *See id*. Since no application for permission to appeal was filed, this Court had no opportunity to review this decision. We disagree with its conclusion and as a result, we decline to apply the Court of

-27-

> Appeals' construction of Tennessee Code Annotated section 69-3-116(c) to
> the contractual language at issue in this case.

*Cracker Barrel Old Country Store*, 284 S.W.3d at 311.

Our Supreme Court next addressed cases interpreting Tenn. Code Ann. § 8-20-101 *et seq*. and found them distinguishable. *Id*. The Court found the reasoning of *Jenkins* analogous to that of the common fund doctrine, an exception to the American rule providing that attorney's fees may be awarded when a litigant succeeds in "securing, augmenting, or preserving property or a fund of money in which other people are entitled to share in common." *Id*. at 312-313 (quoting *House v. Estate of Edmondson*, 245 S.W.3d 372, 377 (Tenn. 2008)). The Court concluded by stating that "statutory construction has been consistent with contract construction in requiring a clear intent to allow attorney fees to a prevailing party before such fees may be awarded." *Id*. at 313-14. Defendant argues that there is no clear intent to allow attorney's fees in Tenn. Code Ann. § 8-20-107; that attorney's fees thus are not allowed under it; that a common fund analysis would need to be performed before Petitioner could recover any attorney's fees; that Petitioner could not prevail under that analysis; and, in light of *Cracker Barrel Old Country Store*, *Jenkins* should be overruled.

We respectfully find Defendant's reading of *Cracker Barrel Old Country Store* unpersuasive for at least two reasons. First, our Supreme Court never disagreed with *Jenkins* or offered any disapproving commentary of it or its progeny whatsoever. In contrast, the Court explicitly disagreed with *State ex rel. Burson*. Second, when our Supreme Court observed that the reasoning of *Jenkins* was analogous—not identical— to that of the common fund doctrine, it never stated that office holders suing for additional staff had to prove the common fund doctrine applies before they can recover any attorney's fees. Rather, the point was merely that attorney's fees under Tenn. Code Ann. § 8-20-107 constitutes an exception to the American rule that was of no avail to plaintiffs in *Cracker Barrel Old Country Store*. That was the extent of the analogy.

As a matter of statutory construction, interpreting "the cost" in Tenn. Code Ann. § 8-20-107 to include attorney's fees makes logical sense, as well. It is difficult to believe that the legislature would create a method by which office holders can sue for additional staff but not provide them a means of paying for legal services crucial to succeeding in their cases. That would render the statute not just ineffective but useless. Our task is to give effect to statutes where possible, not thwart their purpose. *Jenkins* was authored in 1947. The General Assembly has never since amended the language of Tenn. Code Ann. § 8-20-107 despite a succession of court cases interpreting it as they have. Our Supreme Court has stated: "[W]e have long adhered to the rule that when a prior decision has addressed the construction and operation of a statute, the principle of stare decisis will

-28-

apply unless the General Assembly acts to change the statute." *Cooper v. Logistics Insight Corp.*, 395 S.W.3d 632, 639 (Tenn. 2013). We decline Defendant's request to upend over 70 years of precedent. In keeping with *Jenkins* and pursuant to Tenn. Code Ann. § 8-20-107, we hold that reasonable attorney's fees are recoverable by petitioners proceeding under Tenn. Code Ann. § 8-20-101 *et seq*.

We move next to address Petitioner's issue regarding whether she should have been awarded more attorney's fees and expenses than she was. Defendant, for his part, raises an alternative issue that if attorney's fees were recoverable by Petitioner, the Trial Court awarded an excessive amount. We consider these issues together. As this Court explained in *Killingsworth v. Ted Russell Ford, Inc.*:

> There is no fixed mathematical rule in this jurisdiction for determining reasonable fees and costs. This being the case, an appellate court will normally defer to a trial court's award of attorney's fees unless there is "a showing of an abuse of [the trial court's] discretion." *Threadgill v. Threadgill*, 740 S.W.2d 419, 426 (Tenn. Ct. App. 1987); *see also Sanders*, 989 S.W.2d at 345. In evaluating the lower court's exercise of its discretion in a non-jury setting, we review its award *de novo*. We are not authorized to disturb the trial court's award unless we find that the evidence preponderates against the trial court's factual findings. Tenn. R. App. P. 13(d).

*Killingsworth v. Ted Russell Ford, Inc.*, 104 S.W.3d 530, 534 (Tenn. Ct. App. 2002).

Whether an attorney's fee is reasonable is determined by considering the Rules of Professional Conduct 1.5 contained in Rule 8 of the Rules of the Supreme Court, which provides, in pertinent part:

> The factors to be considered in determining the reasonableness of a fee include the following:
>
> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
> (3) the fee customarily charged in the locality for similar legal services;
> (4) the amount involved and the results obtained;
> (5) the time limitations imposed by the client or the circumstances;
> (6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services;

(8) whether the fee is fixed or contingent;

(9) prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and

(10) whether the fee agreement is in writing.

Tenn. Sup. Ct. R. 8, RPC 1.5(a).

Petitioner raises a host of arguments regarding the award. She contends that the Trial Court erred by reducing her attorney's fees and expenses; by not allowing Petitioner to pay her counsel for time the trial court concluded was spent responding to a BPR complaint; and by failing to allow Armstrong to reimburse herself for any of her out-of-pocket expenses, when the Trial Court found a relatively small portion of those expenses to be unreasonable. Petitioner also asserts that the Trial Court erred by reducing her attorney's hourly rates for out-of-court time and for concluding that Petitioner could have hired local counsel at lower rates. Defendant argues, on the other hand, that the attorney's fee award vastly, and wrongly, exceeded the relief Petitioner obtained.

The applicable standard is abuse of discretion, which does not permit us to second-guess or tweak the trial court's decision. Petitioner's myriad proposed line-item changes to the award, were they adopted, would constitute the definition of tweaking. Similarly, we are unpersuaded by Defendant's contentions alleging that the award is disproportional to the relief obtained, especially as the relief provided by the Trial Court is not a one-off—it will remain in effect moving forward year after year. The Trial Court made detailed findings as to each factor contained at Tenn. Sup. Ct. R. 8, RPC 1.5(a). We find no abuse of discretion by the Trial Court, and we decline both party's requests to tinker with the Trial Court's discretionary decision. We affirm the Trial Court's award to Petitioner of $180,870.79 in attorney's fees and expenses.

In one respect, however, Petitioner raises an argument on this issue that does not simply second-guess the Trial Court's discretionary decision. Petitioner observes that the Trial Court failed to allow Petitioner to be reimbursed for those expenses she incurred personally in this case in the amount of $6,085.50. It is not apparent from the Trial Court's order on fees why these expenses were left out. We, therefore, modify the Trial Court's order on fees to the extent it failed to account for those reasonable costs and expenses Petitioner incurred personally for which she sought reimbursement, and remand for the Trial Court to determine and enter an award to that effect.

In her brief's conclusion and in one footnote in her "restatement of the case and facts" Petitioner requests costs incurred after the filing of her fee application, including

attorney's fees and expenses, to be determined either by this Court or on remand in the Trial Court. Petitioner did not identify this issue in her statement of the issues. "Courts have consistently held that issues must be included in the Statement of Issues Presented for Review required by Tennessee Rules of Appellate Procedure 27(a)(4). An issue not included is not properly before the Court of Appeals." *Hawkins v. Hart*, 86 S.W.3d 522, 531 (Tenn. Ct. App. 2001). As Petitioner's request for fees incurred after the filing of the fee application was not identified as an issue in her statement of the issues, we decline to consider it.

As a final matter, Petitioner filed two motions on appeal to consider post-judgment facts. In one, she requests that this Court consider (1) a letter from the TBPR Chief Disciplinary Counsel reflecting the dismissal of Suzanne Cook's BPR complaint against Attorney Matthew Grossman and (2) an email indicating that Ms. Cook did not appeal the dismissal of her complaint. Petitioner states that these facts support her request for a greater award of costs and expenses. The second motion asks this Court to consider the following post-judgment fact: "Since the entry of the [T]rial Court's Judgment, in this cause, and the denial of Defendant's stay motions in the trial and appellate courts, and making use of the additional funding provided in the trial court's Judgment, the Greene County Clerk and Master's Office has been conspicuously open to the public on Wednesdays and during all normal business hours on non-holiday weekdays." We deny both motions. However, the proposed post-judgment facts would not have altered the outcome of this appeal.

In summary, we affirm the Trial Court in its allowing Chancellor Jenkins to testify, in its determination regarding additional staff, and its award of attorney's fees. We modify the Trial Court's order on fees and expenses to the extent it failed to permit Petitioner to reimburse herself for those reasonable expenses she incurred personally, and on remand the Trial Court is to determine and award her reasonable expenses so incurred in addition to those already awarded.

## Conclusion

The judgment of the Trial Court is affirmed, as modified, and this cause is remanded to the Trial Court for collection of the costs below and for further proceedings consistent with this Opinion. The costs on appeal are assessed against the Appellant, Kevin C. Morrison, in his official capacity as Mayor of Greene County, Tennessee, and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

-31-